Filed 2/10/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DEBRA PAIGE,<br><br>        Plaintiff and Appellant,<br>v.<br><br>SAFEWAY, INC.,<br><br>        Defendant and Respondent. | A159731<br><br>(Sonoma County<br>Super. Ct. No. SCV-262580) |

After slipping and falling in the crosswalk of a Safeway parking lot, which was wet due to rain, appellant Debra Paige sued Safeway for negligence and premises liability. She asserted that Safeway failed to exercise due care in the manner it restriped the crosswalk several weeks before her fall by not adopting measures that would have made the crosswalk more slip resistant. The jury returned a defense verdict for Safeway.

On appeal, Paige argues the trial court erroneously prohibited her from cross-examining Safeway's liability expert about standards promulgated by the American Society of Testing and Materials (ASTM) with respect to safe walking surfaces. Paige contends that Evidence Code section 721, subdivision (b)(3) ("Section 721(b)(3)")[1] makes clear that an adverse expert may be cross-examined about a publication established as reliable authority, such as the ASTM standards, regardless of the expert's consideration or

---

[1]     All statutory references are to the Evidence Code unless stated otherwise.

reliance on the publication in forming his or her opinions. We conclude the trial court erroneously prohibited Paige from using the ASTM standard during her cross-examination of Safeway's expert based on the expert's lack of consideration or reliance on it. As this error was harmless, we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.      Paige's Slip and Fall**

At approximately 11:30 a.m. on November 13, 2017, Paige drove to the Safeway on Fourth Street in Santa Rosa. The ground was wet due to rain. After parking in the store lot, she headed towards the store entrance. She was wearing flip-flops and carried a small bag over her shoulders. When Paige reached the crosswalk in front of the store entrance, she checked for traffic. She then took two or three steps onto the crosswalk, slipped, and fell. Paige, who was looking down at her feet when she slipped, said "[i]t was like slipping on ice." Sixty years old at the time, Paige suffered severe injuries as a result of the fall, including a fractured femur.

**B.      Earlier Restriping of Safeway Parking Lot**

About two months before Paige's fall, Safeway contracted with Black Diamond Paving (Black Diamond), an asphalt maintenance contractor in business for 24 years, to restripe the markings in the parking lot, which included the parking stalls, text legends ("slow" or "stop"), and crosswalk. The striping work was to be completed with a single coat of traffic paint.

According to Timothy Cheney, Black Diamond's Director of Operations, the company had done numerous parking lot paving and striping projects over the years. Each year, it handled approximately 200-300 striping jobs. For small scale jobs—those involving 20-30 parking stalls—Black Diamond completed the striping on its own using Ennis-Flint brand traffic paint, the

2

paint used for the Safeway parking lot project. Cheney stated it "is what everybody used." He had no concerns about the paint and considered it safe for the project. Black Diamond had never received a customer complaint about that traffic paint or feedback that it was slippery.

Since it was swamped with work, Black Diamond hired Sawcor Pavement Striping (Sawcor) as a subcontractor for the Safeway parking lot project. Black Diamond had worked with Sawcor, which specialized in painting parking lots, for nearly 15 years on approximately 300-400 jobs. It had hired Sawcor for similar parking lot jobs for other retailers like Home Depot, Walmart, Walgreens, and 7-11s throughout the Bay Area and had never received complaints about Sawcor's work.

Sawcor was owned by Earl Boland, who received his contractor's license around 1990. Since that time, he completed nearly 10,000 striping jobs, 98% of which were parking lots with crosswalks. This included 32 Home Depots in Northern California, shopping malls, and school playgrounds. For all of these projects, Boland used the same traffic paint for each element of the parking lot: the stalls, the text legends, and crosswalks.

On October 4, 2017—about five weeks before Paige's fall—Sawcor restriped the Safeway lot. The job included restriping the text legends and the crosswalks in the parking lot with a single coat of traffic paint. Boland was the one who decided which paint to use for the job, and he selected Ennis-Flint traffic paint. He had no concerns about using this paint for the job. In every job he had done for Black Diamond, including parking lots and crosswalks for other Safeway locations, he had used the same traffic paint.

The brochure for Ennis-Flint traffic paint stated it was suitable for parking lots but did not specifically reference crosswalks or pedestrian walkways. However, Boland understood the manufacturer's reference to

3

"parking lots" in its brochures to encompass all elements of a parking lot design. He had two paint vendors, neither of whom had ever indicated Ennis-Flint traffic paint was inappropriate for crosswalk restriping.

Boland was familiar with another Ennis-Flint product called HotTape and acknowledged that it could appropriately be used in a parking lot, but it was not paint. He had never actually seen it used in a parking lot before. As HotTape could not be used over existing paint, and the Safeway project required him to repaint an existing parking lot, it could not be used for the Safeway project. Boland was not aware of an antislip paint manufactured by Watco when he completed the Safeway lot. He became aware of the Watco product during the course of Paige's lawsuit and learned that, at $140 per gallon, it was more expensive than Ennis-Flint paint which ran $22 per gallon; he had no understanding that the Watco paint was necessarily safer. Even setting aside the cost differential, Boland would not use the Watco paint both because it needed to be hand-rolled (more labor-intensive) and he had no knowledge of how it would perform.

In addition, Boland had never done a striping job which involved adding grit or sand to the striping, nor had he ever been asked to add grit or sand to the striping for a parking lot. He had never seen a parking lot striping job where such grit or sand had been added. In his nearly 30 years in the pavement striping business using Ennis-Flint traffic paint, Boland had never heard that someone slipped and fell on the paint. Nor had he ever received any warning from the manufacturer about potential slippery conditions resulting from its traffic paint.

### C.    Paige's Lawsuit

On June 5, 2018, Paige filed suit against Safeway, alleging causes of action for negligence and premises liability. Safeway cross-complained

4

against Black Diamond for implied contractual indemnity, equitable indemnity, and declaratory relief. Black Diamond filed a cross-complaint against Boland dba Sawcor Pavement Striping for implied indemnity, contribution, and declaratory relief.

### 1. Dr. Shakir Shatnawi's Expert Deposition

On November 7, 2019, Paige deposed Safeway's expert, Dr. Shakir Shatnawi and asked him about a standard for safe walking surfaces promulgated by ASTM. This exchange also occurred at the deposition:

Q:    Are you familiar with the ASTM?

A:    Yes.

Q:    And tell me a little bit about the ASTM. What is the ASTM?

A:    The ASTM provide the standard test methods for laboratories to follow. Many labs that do testing, they follow ASTM.

Q:    Who generally -- well strike that. What does the ASTM do generally?

A:    They develop the standard methods.

Q:    And in the scientific community, is the ASTM standards and their methods well recognized?

A:    Yes.

Q:    And do you agree with me that the ASTM is generally founded on good science and accepted in the scientific community?

A:    Yes.[2]

In excerpts from Dr. Shatnawi's deposition included in the appellate record, Dr. Shatnawi explained that one could follow the ASTM standard for

---

[2]    This portion of Dr. Shatnawi's deposition is quoted in Paige's opening brief but does not appear to be included in the deposition testimony excerpts in the appellate record. Safeway does not contest the accuracy of the testimony or object to its citation.

5

safe walking surfaces, but the ASTM standard did not establish the default rule or the only method to provide safe walking surfaces to customers. Dr. Shatnawi repeatedly rejected the notion that the ASTM established the rules for safe walking surfaces applicable to Safeway. He stated that Safeway should have safe walking surfaces but disagreed that Safeway had to follow the ASTM standards in order to do so.

On November 10, 2019, three days after Dr. Shatnawi's deposition, Paige withdrew her testifying expert witness and re-designated him as a confidential consultant.

### 2. Safeway's Motion in Limine

On November 18, 2019, Safeway filed a motion in limine asking the trial court to preclude Paige from introducing evidence of, referring to, arguing, mentioning, or making any comment about the ASTM standards, including its Standard Practice for Safe Walking Surfaces. Safeway argued the ASTM standards were (1) inadmissible hearsay, (2) irrelevant, (3) improper bases for cross-examining Dr. Shatnawi under section 721, subdivision (b) because he had not relied on them and Paige had not called any witness to testify that Safeway was required to follow the ASTM standards or that they established the applicable standard of care, and (4) more prejudicial than probative under section 352. According to Safeway, permitting Dr. Shatnawi's cross-examination with the ASTM standards would allow the jury to conclude, incorrectly, that Safeway was required to follow the ASTM standards and that any failure to do so was a breach of the standard of care.

In Paige's written opposition, she argued that the ASTM standards fell with the scope of permissible cross-examination of an opposing expert witness as they were "reliable authority" within the meaning of Section 721(b)(3).

6

Paige further countered that the ASTM standards were highly probative of Safeway's negligence and their exclusion was not warranted under section 352.

The motion in limine was argued over two days. At the outset of the second day, the court issued a tentative ruling granting Safeway's motion subject to certain qualifications. As the starting point for its analysis, the court focused on whether the ASTM standard was established to be "reliable authority" under Section 721(b)(3), and stated, "[A]rguably, from the questioning by [Paige's counsel] at [Dr. Shatnawi's] deposition, arguably, that has been satisfied." The court then observed that a Law Revision Commission Comment for section 721, subdivision (b) provided that " 'subdivision (b) does not permit cross-examination of an expert witness on scientific, technical, or professional works not referred to, considered, or relief on by him.' " The court cited another Law Revision Commission Comment, which "caution[ed] the [c]ourts and counsel": " 'However, a rule permitting cross-examination on a technical treatise not considered by the expert would permit the cross[-]examiner to utilize this opportunity not for its ostensible purpose to test the expert's opinion, but to bring before the trial of fact the opinions of absentee authors without the safeguard of cross-examination.' " These comments persuaded the court that even if the ASTM standards were established to be reliable authority, Paige was still foreclosed from cross-examining the expert about the content of any such publication not relied upon by the expert and for which there could be no cross-examination. Based on its analysis, the court allowed Paige to cross-examine Dr. Shatnawi on his awareness of the ASTM standards without mentioning the content of those standards.

The court explained its tentative decision as follows: "[Paige's counsel] will be allowed to ask [Dr. Shatnawi] if he is familiar with [the ASTM standard], and be able to ask, does he recognize [the standard] as the example questions. Do you know about this study? Are you aware of this publication? Yes or no. [¶] But then, I'm going to grant [Safeway's] Motion in Limine that there will be no reference to any of the content of the [ASTM] guidelines, because there has been no affirmative showing to meet the necessary requirements and to address the cautions and concerns about using this to bring in testimony when there's not an ability for cross-examination, because, again, to bring before the trier of fact and to, again, violate the safeguards, and that to allow a cross-examination without the safeguards, so that the cross-examiner's questions must not and cannot reflect the content or tenor of the material, even if the expert's aware of it." The court stated it would reconsider its ruling if Dr. Shatnawi testified differently at trial than what he testified to at deposition. After further argument, the court adopted its tentative decision as the ruling of the court.

### 3.    Dr. Shatnawi's Trial Testimony

At trial, Dr. Shatnawi, who had been jointly retained by Safeway, Black Diamond, and Sawcor, was designated an expert in the field of transportation and traffic engineering and parking lot design and material selection. By way of background, he earned a Ph.D. in civil engineering with an emphasis on transportation engineering, and a master's degree in engineering with an emphasis on construction engineering. For 20 years, he worked for the California Department of Transportation (Caltrans) on highway design, pavement design, materials, construction, specifications, guidelines, and manuals. His decades of experience encompassed parking lot design, including the striping of roadways and parking lots and the design and

8

materials selected for such projects. He had expertise in selection of materials to use for pavement, asphalt, and other surfaces. After he retired from Caltrans in 2010, he began his private consulting business and also taught undergraduate courses in transportation and highway engineering.

Dr. Shatnawi reviewed discovery materials and paint brochures, inspected the parking lot at issue, and utilized his own education, experience and knowledge in formulating his opinions. He understood the paint used for the restriping of the Safeway lot was Ennis-Flint traffic paint, which the manufacturer indicated was appropriate for parking lots. When a manufacturer says that its paint is appropriate for parking lots it encompasses all the various marking in a parking lots: the vehicle stalls, speed bumps, the disabled parking sections, directional arrows, "slow" or "stop" directives, as well as crosswalks. A striping paint that could cause slips would not be recommended for parking lots given they are a place where people walk. He had never designed a parking lot which called for a different paint to be used for the various elements.

Based on his education and experience, his review of materials, and his inspection of the parking lot, it was Dr. Shatnawi's opinion that the Ennis-Flint traffic paint used to restripe the crosswalk in the Safeway parking lot was safe, reasonable, and appropriate. He acknowledged there were additives such as sand, grit, or glass beads that could be added to paint to increase the friction of a smooth surface, but opined that it was not necessary to add any of these materials to the Ennis-Flint traffic paint used to restripe the Safeway parking lot and crosswalk. A combination of elements or materials—that is, the texture of the surface as well as the traction of the tire or body moving on the surface—worked to achieve a slip resistant surface. The surface texture was "the most important part" of ensuring that a

9

roadway or pavement is slip resistant. He added that an asphalt pavement is a surface with texture that makes it slip resistant. Dr. Shatnawi acknowledged that Safeway could have used a different product, such as Ennis-Flint HotTape or Watco antislip traffic paint. However, the fact that other products could have been used did not mean using Ennis-Flint traffic paint was inappropriate or unreasonable for the Safeway parking lot job.

Boland's testimony that he had used Ennis-Flint traffic paint for this type of parking lot restriping job for three decades without any such additives was significant to Dr. Shatnawi's opinion. The absence of any complaint indicated "no issues related to slipperiness of this paint." Based on materials he reviewed, Dr. Shatnawi further understood that there were no other falls on the crosswalk from Sawcor's initial restriping through his work on the case, which encompassed the rainy seasons in 2017 and 2018. He opined that the crosswalk was not slippery when wet. He also opined that certain flip-flops which are "usually foamy, slippery" have no traction and would be slippery and not reasonable to wear in the rain.

On cross-examination, Dr. Shatnawi explained that he was not sure whether Safeway did anything to determine whether the crosswalk was slip resistant. He had no record from Safeway concluding the crosswalk was slip resistant and had not reviewed any information showing testing on the crosswalk to determine whether it was slip resistant, nor had he conducted such tests. He agreed that nowhere in the Ennis-Flint traffic paint product literature did the manufacturer state the paint was "antislip" or "slip resistant." He acknowledged that one reasonable way for Safeway to protect its customers from slipping on wet painted crosswalks was to use slip resistant traffic paint, but could not say that Safeway did not do that with respect to the crosswalk at issue and the paint used. He was aware that

10

Ennis-Flint marketed another product specifically for pedestrian crosswalks but again noted that, according to its manufacturer, the paint used in the Safeway lot was appropriate for parking lots. Dr. Shatnawi also recognized that sand or grit could have been added to the paint to increase friction in the crosswalk or that a specific antislip paint could have been used. He was not asked about the ASTM or any ASTM standard by Paige's counsel.

### 4.    Verdict and Appeal

The jury returned a defense verdict for Safeway, and judgment was entered in Safeway's favor. This appeal followed.

## DISCUSSION

Paige argues the trial court committed prejudicial error under Section 721(b)(3) by precluding cross-examination of defense expert Dr. Shatnawi regarding the content of the ASTM Standard Practice for Safe Walking Surfaces.

### A.    Forfeiture

Safeway asserts Paige forfeited her claim of error by failing to ask the foundational questions provided by the court and by failing to renew her argument during trial. We disagree.

For this argument, Safeway relies on the rule stated in *People v. Holloway* (2004) 33 Cal.4th 96 (*Holloway*), that "[a] tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself." (*Id.* at p. 133.) Safeway also cites *People v. Ennis* (2010) 190 Cal.App.4th 721, 735 (*Ennis*) for its assertion that a litigant forfeits a claim that the trial court improperly limited expert testimony "by failing to pursue the matter after the court indicate[s] a

11

tentative decision not to allow [the evidence]." (*Id.* at p. 735.) Under these authorities, Safeway notes the trial court told Paige's counsel at the outset of trial that the in limine ruling was "subject to change" and it would be willing to re-evaluate the ruling during trial. Safeway argues that Paige's counsel's decision to not ask Dr. Shatnawi foundational questions approved by the court to lay a foundation to cross-examine him about the ASTM standards or to revisit its ruling forfeited her claim.

However, and critically, both *Holloway* and *Ennis* involved tentative evidentiary rulings. In *Holloway*, *supra*, 33 Cal.4th 96, the court's rule expressly stated "a *tentative pretrial evidentiary ruling*" would not preserve the issue for appeal. (*Id.* at p. 133, emphasis added.) *Ennis*, *supra*, 190 Cal.App.4th 721, also involved a ruling that was not yet final. There, Ennis's counsel sought admission of certain expert testimony and asked the court to pursue the matter further the following day after there had been three discussions about the evidence. (*Id.* at p. 735.) The court agreed but Ennis's counsel did not pursue the issue the next day. (*Ibid.*) The appellate court explained that the trial court had "made clear it had not [finished its consideration of the issue], and explicitly agreed to hear further argument on the issue the next day." (*Id.* at p. 736.) However, the next day, Ennis apparently choose not to pursue the issue further and limited his questioning of the expert to other matters. (*Id.* at p. 735.) Since it was Ennis—and not the court—who abandoned the issue, he forfeited his claim of error. (*Id.* at p. 736.)

Here, in contrast, the trial court had issued a final ruling on Safeway's motion in limine that Dr. Shatnawi could not be cross-examined about the content of any ASTM standard. At the outset of the second day of argument on the motion, the trial court announced a tentative and, after allowing for

additional argument, the court made clear that it was adopting its tentative as the final decision of the court. It was unequivocal that such cross-examination on the content of the ASTM standard would not be allowed because Dr. Shatnawi had not considered or relied on the ASTM in formulating his opinion. Since the court's in limine ruling was not tentative, neither *Holloway* or *Ennis* applies. Further, the court's willingness to revisit its ruling did not undermine the finality of the court's ruling. The possible revisiting was contingent on Dr. Shatnawi testifying differently at trial as compared to his deposition testimony, and imposed an uncertain condition precedent for the court's reconsideration. This did not revert the court's ruling on the in limine motion to a tentative decision.

Accordingly, there has been no forfeiture for the reasons Safeway asserts, and we proceed to Paige's claims of errors.

### B.    Standard of Review

The parties dispute the applicable standard of review. Paige contends that this appeal tenders a question of law to be reviewed de novo as the trial court's ruling on Safeway's motion in limine was based entirely on a question of statutory interpretation, namely, whether Section 721(b)(3) allows an expert to be cross-examined about the content or tenor of a publication established as reliable authority even if the expert has not considered or relied upon that publication in formulating his or her opinion. Safeway maintains the trial court's evidentiary ruling was a matter of judicial discretion regarding whether the ASTM Standard Practice for Safe Walking Surfaces was shown to be sufficiently reliable so as to permit it to be used on cross-examination and thus should be reviewed under an abuse of discretion standard.

We need not resolve this dispute. As explained below, under either standard we conclude the court erred in limiting Paige's cross-examination of Dr. Shatnawi on the basis that he had not considered or relied on the ASTM standard in forming his opinions, but the error was harmless.

## C. Section 721(b)(3)

Paige argues that the plain language of Section 721(b)(3) unambiguously allows a party to cross-examine an adverse expert about the content and tenor of a publication—regardless of whether the expert referred to, considered, or relied upon it in reaching his or her opinions—as long as the publication has been established to be reliable authority. She contends that under Section 721(b)(3) she should have been allowed to cross-examine Dr. Shatnawi about the ASTM Standard Practice for Safe Walking Surfaces.

### 1. Statutory Analysis

This case appears to present issues of first impression regarding the interpretation of Section 721(b)(3).

" ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory

14

scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " (*Meza v. Portfolio Recovery Associates, LLC* (2019) 6 Cal.5th 844, 856–857.)

With these principles in mind, we begin by examining the language of Section 721, subdivision (b), which states in its entirety: "If a witness testifying as an expert testifies in the form of an opinion, he or she may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless any of the following occurs: [¶] (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion. [¶] (2) The publication has been admitted in evidence. [¶] (3) The publication has been established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. [¶] If admitted, relevant portions of the publication may be read into evidence but may not be received as exhibits." (§ 721, subd. (b)(1)-(3).)

Thus, Section 721(b)(3) sets forth three statutorily enumerated situations in which an expert may be cross-examined about the content or tenor of a publication. Since the statutory language prefaces these three situations with the language "unless *any* of the following occurs," each situation serves as an independent basis for use of a publication on cross-examination. (Italics added.) The first situation is when the expert has referred to, considered, or relied upon the publication to reach his or her opinion. (§ 721, subd. (b)(1).) The second situation is when the publication has been admitted into evidence. (§ 721, subd. (b)(2).) The third situation, at issue here, allows for an adverse expert to be cross-examined about the content or tenor of a publication when it has been "established as a reliable authority." (§ 721, subd. (b)(3).)

15

The plain language of Section 721(b)(3) unambiguously allows a party to cross-examine an adverse expert about the content and tenor of a publication so long as the publication has been established as a reliable authority.  For a publication to be the basis for cross-examination under Section 721(b)(3), the statute does not require the expert to have referred to, considered, or relied on the publication in forming his or her own opinion in order to be cross-examined about its content.  There is no indication in Section 721(b)(3) or in section 721, subdivision (b) generally that use of a publication established to be reliable authority is subject to any of the requirements in subdivisions (b)(1) or (b)(2).  Accordingly, the trial court erred in ruling such consideration or reliance by the expert was necessary.

Although we need not go further because the statutory language is unambiguous, we will "look to legislative history to confirm our plain-meaning construction of [the] statutory language."  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046.)  Here, the legislative history leaves no doubt that Section 721(b)(3) was intended to allow a party to cross-examine an adverse expert about any publication that has been established as a reliable authority, whether or not the expert referred to, considered, or relied on that publication for his or her opinion.[3]

As originally enacted in 1965, section 721 read as follows:  "If a witness testifying as an expert testifies in the form of an opinion, he may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless:"  (1) The witness referred to, considered, or relied upon such publication in arriving at

---

[3]     Paige requested judicial notice of the following legislative materials: (1) Senate Bill 73, as amended May 1, 1987; (2) the Senate Judiciary Committee bill analysis for Senate Bill 73; and (3) the chaptered version of Senate Bill 73.  We granted the unopposed request.

16

or forming his opinion; or (2) Such publication has been admitted in evidence. (Former § 721.) Thus, the original version of section 721 only allowed an opposing expert to be cross-examined on a publication in these two circumstances and provided no means for a party to cross-examine an adverse expert on a publication absent the expert's consideration or reliance on it, or its admission into evidence.

In 1997, however, the State Bar of California sponsored a proposal as part of Senate Bill 73 (SB 73) that section 721, subdivision (b) be amended to permit cross-examination of expert witnesses on the content of a publication if it has been established as a reliable authority.

The Legislative Counsel's digest for SB 73 noted that "[e]xisting law [did] not permit cross-examination of an expert witness on the contents of texts, treatises, journals, or similar publications unless the witness has referred to, considered, or relied upon publication in forming his or her opinion, or the publication has been already admitted into evidence" and that SB 73 "would permit cross-examination of expert witnesses on the contents of a publication if it has been established as a reliable authority." (Legis. Counsel's Dig., Sen. Bill No. 73 (1997–1998 Reg. Session).)

In particular, SB 73 proposed that section 721 be amended to add the following italicized provisions: "(b) If a witness testifying as an expert testifies in the form of an opinion, he *or she* may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless *any of the following occurs*: [¶] (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his *or her* opinion; [¶] (2) *The* publication has been admitted in evidence. [¶] *(3) The publication has been established as a reliable authority by the testimony or admission of the witness or by other*

17

*expert testimony or by judicial notice.*  [¶]  *If admitted, relevant portions of the publication may be read into evidence but may not be received as exhibits.*  (Sen. Bill No. 73 (1997–1998 Reg. Session).)  The newly proposed subdivision (b)(3) is the provision by which Paige sought to introduce the ASTM standard and the one at issue in this appeal.

In its bill analysis for this amendment, the Senate Judiciary Committee explained:  "Under current law, an expert witness may not be cross-examined on the contents of a learned treatise unless the witness has referred to, considered, or relied upon the treatise in forming his or her opinion, or the treatise has already been admitted into evidence.  'Yet,' proponents for the proposed change contend, 'it may be precisely those reliable authorities the expert has not considered that will provide the best cross-examination of that expert.' "  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 73 (1997–1998 Reg. Sess.) May 13, 1997.)  The bill analysis observed, "Proponents [of the amendment] contend that current law encourages gamesmanship by allowing 'pseudo' experts to testify as to a matter and avoid questioning on how his views differ from reliable treatises simply by ignoring the existence of the more learned but contrary treatises."  (*Ibid.*)

The bill analysis further provided:  "Sponsored by the State Bar, this provision substantially adopts Rule 803(18) of the Federal Rules of Evidence[4] to permit the use of published treatises and other similar publications 'which are established as reliable authority by the testimony or admission of the

---

[4]     Federal Rule of Evidence 803(18) sanctions as an exception to the hearsay rule the admission of "a statement contained in a treatise, periodical, or pamphlet" if "(A) the statement is called to the attention of an expert witnesses on cross-examination or relied on by the expert on direct examination; and (B) the publication is established as a reliable authority by the expert's admission or testimony, by other expert's testimony, or by judicial notice."  (Fed. R. Evid. 803(18).)

witness or by other expert testimony or by judicial notice,' to be used to cross-examine an expert witness, *whether or not the expert has himself or herself referred to it.* The requirement that the treatise be established as reliable authority, states the Bar, 'ensures that outdated or otherwise unreliable treatises will not be used inappropriately to discredit an expert's opinion.' " (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 73 (1997–1998 Reg. Sess.) May 13, 1997, emphasis added.)

In the State Bar's view, SB 73 "would . . . allow the expert's opinion to be cross-examined against learned treatises if the expert testifies contrary to well-accepted treatises. It would also tend to reduce litigation costs by permitting recognized and learned treatises to be used to counter opposing expert opinions through cross-examination, thereby, reducing the time and expense of having to call another expert to battle the opposing expert to establish a position which is consistent with established thought." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 73 (1997–1998 Reg. Sess.) May 13, 1997.)

SB 73's legislative history reinforces that the trial court erred in ruling that Paige could not cross-examine Dr. Shatnawi on the content of the ASTM standards because he had not referred to, considered, or relied on them in formulating his opinion. The Legislative Counsel's Digest and committee bill analysis express an intent to expand existing law that limited party's cross-examination of an opposing excerpt to only those publications considered or relied upon by the expert or admitted into evidence. The legislative materials also underscore the legislative intent that publications established to be reliable authorities can be used to cross-examine an adverse expert "whether or not the expert has himself or herself referred to it." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 73 (1997–1998 Reg. Sess.) May 13, 1997.)

19

Thus, an expert's reference to, consideration, or reliance on a publication is not required for the expert to be cross-examined on it as long as the publication was established to be reliable authority.

At trial, Safeway argued that permitting Dr. Shatnawi's cross-examination with the ASTM standards was improper because he did not rely on the standards in forming his opinion. On appeal, Safeway no longer appears to dispute this statutory analysis, stating it "does not dispute that [S]ection 721(b)(3) allows an expert to be cross-examined regarding a publication where the statutory requirements are met." As such, we need not discuss Section 721(b)(3)'s statutory analysis any further.

### 2. "Reliable Authority"

We must next consider whether the ASTM standard on safe walking surfaces constituted "reliable authority" within the meaning of Section 721(b)(3). As noted, ante, under Section 721(b)(3) a party may cross-examine an adverse expert witness with a publication that has been "established as reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice." (§ 721, subd. (b)(3).) Accordingly, the statute provides three means by which a party may establish a publication to be "reliable authority:" (1) by the testimony or admission of the witness; (2) by other expert testimony; or (3) by judicial notice.

Paige contends that the ASTM standard was established as reliable authority by the first means, Dr. Shatnawi's own testimony.[5] The parties have not cited any California law discussing the type of witness testimony or admission establishing a publication as "reliable authority" under Section

---

[5] There is no basis to establish the ASTM standard as reliable authority based on the testimony of another expert or by judicial notice. There is no testimony in the record from any other expert besides Dr. Shatnawi. Indeed, weeks before trial began, Paige withdrew her own expert.

20

721(b)(3).  Since Section 721(b)(3) adopted the learned treatise exception to the hearsay rule contained in Federal Rules of Evidence section 803(18), we look to federal case law construing that provision.  (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 73 (1997–1998 Reg. Sess.) May 13, 1997.)  In *Meschino v. North American Drager, Inc.* (1st Cir. 1988) 841 F.2d 429, the court considered whether the contents of all issues in a periodical could be introduced under Rule 803(18) by testimony that the magazine was highly regarded.  (*Id.* at p. 434.)  The court explained, "Mere publication cannot make them automatically reliable authority.  The price of escape from cross-examination is a higher standard . . . .  The words have a serious meaning, such as recognition of the authoritative stature of the writer, or affirmative acceptance of the article itself in the profession."  (*Ibid.*)  Here, Dr. Shatnawi testified at deposition that the ASTM is a well-recognized international standards organization whose views are generally accepted in the scientific community.  This testimony sufficiently established that the ASTM standard was a reliable authority.[6]

Safeway argues Dr. Shatnawi's deposition testimony "did not establish that the ASTM standards were authoritative or reliable for purposes of cross-examination."  In Safeway's view, Dr. Shatnawi's testimony was deficient

---

[6]     As noted, ante, this portion of Dr. Shatnawi's deposition qualifying the ASTM standard as "reliable authority" does not appear to be included in the deposition testimony excerpts in the appellate record.  It was Paige's obligation to present an adequate record for appellate review (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574), absent which we presume the judgment is correct.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  However, even without the cited excerpts, there is enough in the record for us to evaluate Paige's contentions.  The record shows that the trial court presumed that the ASTM was established to be reliable authority based on Dr. Shatnawi's deposition testimony.  Further, Safeway does not contest the accuracy of Dr. Shatnawi's quoted testimony or object to its citation.

21

because Paige "never specifically asked [him] if the ASTM standards were reliable or authoritative" and because Dr. Shatnawi repeatedly stated they were not mandatory and Safeway was not obligated to follow them, undercutting any showing of their "authoritative[ness]." Paige was not required to ask Dr. Shatnawi directly whether the ASTM standards were reliable or authoritative to elicit testimony establishing them to be reliable authority. Nor did it matter that Dr. Shatnawi testified that the ASTM standard for safe walking surfaces was not mandatory for Safeway. Safeway provides no authority for its view that a publication's content must impose mandatory rules on a defendant for it to constitute reliable authority. As Section 721(b)(3)'s plain language does not impose this requirement and the legislative history of Section 721(b)(3) does not support this view, we reject the argument.

Accordingly, Dr. Shatnawi's deposition testimony containing his acknowledgement that ASTM standards are founded on good science, well-recognized and accepted in the scientific community, was sufficient to establish the ASTM standard to be reliable authority under Section 721(b)(3).

### D.     Harmless Error

As the court's erroneous construction of Section 721(b)(3) did not result in harm, we affirm the judgment.

An evidentiary ruling will not be reversed if there is no showing that excluding the evidence resulted in a miscarriage of justice. (§ 353, subd. (b); see also Code of Civ. Proc., § 475 ["[n]o judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and

22

suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed"].) "In civil cases, a miscarriage of justice should be declared only when . . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 692.) Prejudice from error is never presumed but must be affirmatively demonstrated by the appellant. (*Hernandez v. County of Los Angeles* (2014) 226 Cal.App.4th 1599, 1616.)

Here, we are not persuaded that the trial court's error was prejudicial. Paige presented no evidence that any ASTM standard was compulsory in order to establish the standard of care. She presented no evidence that Safeway's decision to not adhere to certain provisions in the ASTM standard was a substantial factor in causing her fall. She had no expert testify that the crosswalk was, in fact, not slip resistant, and there is no indication in the record that she had performed an inspection or test of the crosswalk. Further, Paige presented no expert or other witness to testify that, had Safeway followed the ASTM standard, she would not have fallen.

Meanwhile, Safeway presented ample evidence to support the jury verdict and that the paint used in the crosswalk was safe and appropriate. Safeway presented the testimony of Timothy Cheney, Black Diamond's Director of Operations, and Sawcor's owner, Earl Boland, who together had decades of experience striping and restriping parking lots for major retailers throughout the Bay Area. Cheney testified that Ennis-Flint traffic paint was what "everybody used," and that Black Diamond completed 200-300 striping jobs per year with the paint without complaint. Boland, who had been doing striping work for close to 30 years, testified that he had used the same Ennis-

23

Flint traffic paint in approximately 10,000 jobs without issue. Their testimony supported the view that using Ennis-Flint traffic paint was reasonable method for striping all elements in a parking lot, including crosswalks, and for providing a slip resistant walking surface.

Further, while acknowledging Safeway's responsibility to provide safe walking surfaces for its customers, Dr. Shatnawi, the trial's sole testifying expert with two decades of Caltrans experience on roadways and parking lots, stated that the Ennis-Flint traffic paint was safe, reasonable, and appropriate for use on the parking lot crosswalk. He also stated that it was not necessary to add sand or grit to the paint to restripe the crosswalk, and that the texture of the parking lot surface contributed to making it slip resistant.

Discussing the "substantial factor" standard for causation, Paige asserts that the "question with respect to causation is simply whether as a matter of ordinary experience," Safeway's alleged failure to follow the ASTM guideline as to making painted crosswalks slip resistant "might be expected to result in someone like [Paige] slipping on the wet painted crosswalk when it rains." While Paige concludes that Safeway's purported failure to follow the ASTM was a substantial factor in causing her injury, it is not readily apparent that a jury would have made that inference based on Dr. Shatnawi's testimony. As Paige points out, the ASTM standard she sought to use recommended the use of an abrasive addition, cross-cut grooving, texturing, *or other appropriate means* to render the painted surface of walkways slip resistant when wet conditions are reasonably foreseeable. (Emphasis added.) Dr. Shatnawi testified that the texture of the asphalt surface made it slip resistant and, thus, the jury could have also reasonably

24

inferred that the texture of the surface comprised "other appropriate means" to help make the crosswalk slip resistant.

Further, responding to the ample evidence that Safeway's use of Ennis-Flint traffic paint for the crosswalk met industry standards, Paige asserts that "[t]his case was far from a slam dunk for Safeway." She argues that Safeway's evidence established at most Safeway's conformity with the industry standard but that such conformity was not conclusive on the issue of whether the defendant exercised due care. She contends, "Had the jury known that an international standards organization (the ASTM) has promulgated a standard practice for safe walking surfaces which recommends the use of an abrasive additive, cross-cut grooving, texturing, or other appropriate means to render the painted surface of walkways slip resistant when wet conditions are reasonably foreseeable, there is a reasonable chance the jury would have concluded it was unreasonable for Safeway not to implement such measures when it repainted the lines of the subject crosswalk." We are not persuaded. Again, based on Dr. Shatnawi's testimony, the jury could have also concluded that Safeway had taken appropriate measures to make its crosswalk slip resistant. In addition, the absence of any evidence that following the ASTM was required—and Dr. Shatnawi's likely testimony that it was not—makes Paige's assessment of what the jury would have concluded had it known about the ASTM even more tenuous.

Accordingly, we conclude that it is not reasonably probable that a result more favorable to Paige would not have been reached in the absence of the trial court's erroneous evidentiary ruling.[7]

---

[7] Because we find the error was harmless, we do not need to consider the other grounds Safeway asserts for excluding the evidence.

**DISPOSITION**

The judgment is affirmed. The parties are to bear their own costs on appeal.

_____
Petrou, J.

WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Rodríguez, J.

_Paige v. Safeway, Inc./A159731_

27

Trial Court:      Sonoma County Superior Court

Trial Judge:     Hon. Patrick Broderick

Counsel:        Law Offices of Tiffany J. Gates, Tiffany J. Gates; Abbey, Weitzenberg, Warren & Emery, Michael D. Green and Scott R. Montgomery, for Plaintiff and Appellant.

Tate & Associates, Lauren E. Tate and Rachel H. Leonard, for Defendant and Respondent.